STATE OF NORTH CAROLINA v. ERNEST RAY PERRY

No. 13

(Filed 11 March 1970)

**1. Criminal Law § 53;   Homicide § 15—   competency of evidence — cause of death — pathologist**

It was competent for the pathologist who performed an autopsy on the body of deceased to testify in a homicide prosecution that the death of deceased was caused by a projectile, or bullet, which entered through deceased's lower lip and lodged in his right tonsil.

**2. Criminal Law §§ 34, 169—   inadvertent testimony of other crime — prejudicial effect — instruction to jury**

Where an officer, in response to the solicitor's question whether he had a warrant for defendant's arrest for felonious assault, inadvertently stated that he had two warrants charging defendant with felonious assault, any harmful effect from the officer's reference to a second warrant was corrected by the court's instruction to the jury to disregard the evidence of a second warrant.

**3. Criminal Law §§ 75, 76—   incriminating statements to jailmate — admissibility — voir dire hearing**

Where a defendant charged with homicide told his jailmate that he had shot the deceased, the jailmate's testimony of defendant's incriminating statement was admissible in evidence without the necessity of a *voir dire* hearing to determine whether the statement was freely and voluntarily made.

**4. Homicide § 14—   presumption of malice — intentional use of pistol**

In a prosecution for homicide committed with a pistol, malice may be presumed from evidence which satisfies the jury beyond a reasonable doubt that the death of deceased proximately resulted from a pistol shot intentionally fired at him by defendant.

**5. Homicide § 21—   first degree murder — sufficiency of evidence**

To sustain a verdict of murder in the first degree, the evidence must be sufficient to support a finding that the fatal shot was fired after premeditation and deliberation.

**6. Homicide § 4—    premeditation defined**

Premeditation means thought beforehand for some length of time, however short.

**7. Homicide § 21—    first degree murder — motion to dismiss — question presented**

On motion to dismiss a charge of murder in the first degree, the trial court must determine the preliminary question whether the evidence in its light most favorable to the State is sufficient to permit the jury to make a legitimate inference and finding that the defendant, after premeditation and deliberation, formed a fixed purpose to kill and thereafter accomplished the purpose.

**8. Homicide § 4—    premeditation and deliberation — length of time**

No fixed length of time is required for the mental process of premeditation and deliberation, and it is sufficient if these processes occur prior to, and not simultaneously with, the killing.

**9. Homicide § 4—    premeditation — circumstantial proof**

Premeditation and deliberation are not usually susceptible of direct proof, and are therefore susceptible of proof by circumstances.

**10. Homicide §§ 18, 21—    first degree murder — nonsuit — evidence of premeditation and deliberation — shooting of stranger in another car**

In the first degree murder prosecution of a defendant, a passenger in one car, who fired a pistol at a stranger driving another car in a parallel lane, thereby fatally wounding him, there was sufficient evidence of defendant's premeditation and deliberation to take the case to the jury, where there was no evidence of excuse or provocation, and where the State offered the testimony of defendant's fellow passengers that as the two cars came abreast of each other the defendant exchanged words with the deceased, a Negro; that the defendant reached for the pistol and fired three shots at the deceased; and that defendant told his driver to back up and let him "finish off" the deceased.

APPEAL by defendant from *Carr, J.,* September 8, 1969 Session, Wake Superior Court.

The defendant, Ernest Ray (Buddy) Perry, was charged, by a grand jury indictment, with the first degree murder of George Edward Kitchen. The offense occurred on January 19, 1969. Upon arraignment and before plea in the Superior Court, the defendant, through his court appointed counsel, made three consecutive motions: (1) To quash the bill of indictment, (2) To remove the cause to another county for trial, (or in the alternative) (3) To summon the trial jury from another county. The court, in turn, overruled each motion and ordered the trial jury drawn from Wake County.

At the trial, which began on September 8, 1969, the State's evidence, summarized or quoted, disclosed the following. On Sunday

evening, January 19, 1969, George Edward Kitchen left home to go to Tops Service Station on Peace Street to have his automobile serviced so that his wife might drive it to work early Monday morning. From an apartment window near the intersection of Peace and Wilmington Streets, Leroy Turner saw two automobiles in parallel lanes moving west on Peace Street. A light colored vehicle was on the left, the Kitchen car was on the right. While the vehicles were abreast of each other, Turner saw a flash from the light colored automobile, and heard pistol shots, after which the light colored vehicle left the scene at high speed. Kitchen drove to Tops, a short distance from the intersection. When Kitchen drove up to the service station, he was bleeding, groggy, and able to stand with difficulty. The attendant at the station called the police. An ambulance carried the wounded man to Rex Hospital.

Dr. Sparrow's examination at the hospital disclosed a fresh bullet wound which entered Kitchen's mouth through the left lower lip, shattered three teeth on the left under jaw, passed through the tongue and became embedded in the right tonsil. Dr. Sparrow, by the use of forceps, removed the bullet from the tonsil. He testified that immediately back of the right tonsil is located the right carotid artery which feeds a section of the brain. "The internal carotid is not right up against the tonsil. There is a muscle between the tonsil and the artery and there is fascaial . . . ligament type material, and there is also a sheath around the carotid artery . . . a protective sheath. I was able to tell that there was no penetration any further than the position of the bullet itself. I would not be able to observe any effects of compression beyond that point unless the compression were severe enough to completely block the artery. . . ."

After examination and tests, Dr. Sparrow found "He did not show any weakness of any part. He did not show any signs of any complications, and he was not bleeding so that it did not appear that his condition required hospitalization. . . . The teeth were broken. Some fragments were hanging in the gum. . . . the upper teeth were not involved." Being of the opinion "this work required the attention of a dentist" Dr. Sparrow referred the patient to his dentist with a request he (Dr. Sparrow) be given notice of any complications. After the dental treatment Sunday night, the deceased went home but did not rest well and did not appear normal. On Monday morning, January 20, he was admitted to Wake Memorial Hospital where he died about Noon on January 23, 1969.

Dr. Pate, Pathologist, performed an autopsy on the body of

George Edward Kitchen. After qualifying as an expert in the field of Pathology, Dr. Pate described his findings and testified: "If I excluded everything from my consideration except what I saw upon my examination, I would say with medical certainty that whatever projectile had entered the channel that I observed caused the death of the deceased."

After the shooting, but before the victim's death, the officers obtained a warrant charging the defendant with a felonious assault on Kitchen. While Officer Johnson was on the stand, the solicitor asked whether at the time of arrest he had a warrant for the defendant charging the felonious assault on Kitchen. The officer volunteered the statement that he had two warrants charging the defendant with assault with a deadly weapon. The defendant objected and moved for a mistrial. The court cautioned the jury not to consider the second warrant and overruled the motion.

The State called as witnesses Bobby Ray Stallings and Larry Wilson, who were the defendant's companions at the time of the shooting. Stallings is a brother-in-law of the defendant. In substance, Stallings testified that he, Larry Wilson, the defendant, and others, had been driving around town during the afternoon. All were drinking. The other members of the original party went home, leaving the three. Stallings was driving his gold colored automobile, Wilson was seated in the middle, and the defendant was on the right, in the front seat. They were driving north on Wilmington Street toward its "T" intersection with Peace Street. As they turned left on Peace they came abreast of the deceased's vehicle on their right. Stallings testified:

"The first thing I heard was him and Buddy having words. I don't remember who started them. They had words off and on — I think I was staying along close to him, just to argue with him. He was a colored man. I did not say anything to him. Larry did not say anything that I know of. Nobody said anything to him except Buddy. After the shots rang out, Larry said the man had fell over the wheel, and I hollered at Buddy and said, 'Buddy, you have killed that man.' And Buddy said, 'If you will back up, I will finish it.' "

Larry Wilson, as a witness for the State, testified:

". . . When we got down towards the end of Wilmington is when this car was beside us; we were on the inside and the other car outside, and we turned on Peace to the left, still were on the inside lane, and the other car was in the righthand lane, on the outside lane.

Bobby Stallings was driving his car. I was sitting in the center, defendant was sitting on the right-hand on the outside, right-hand side, in the front. There was no one in the back seat. We got down there and after we turned the corner off Wilmington, as we approached Peace Street, we were just riding along, and Buddy was saying something, or the man said something to Buddy; I don't know which way it was; and when we turned to the street, they was still talking among each other; when we turned the corner and headed down Peace Street then Buddy just reached for a gun and he started firing, shot at him three times; I heard the gun go off three times.

The man in the car was a colored man. I told Buddy after he fired three times I seen the man slumping over the steering wheel; I said, 'I believe you killed a man.' He said to back up to see if he'd done a good job, finish him off. And then from there, after Buddy had shot him, Bobby just went on between cars trying to get out of the way — going east (sic) on Peace Street, towards Cameron Village. There were other cars in the eastbound lane of Peace Street. We had to pull out in the left lane to go on Salisbury Street to get around the cars in front of us."

The State, as one of its witnesses, called Bobby Wayne Pierce who testified that he was confined in the Wake County Jail during the summer of 1969. The defendant, Ernest Ray Perry, was also confined in the jail awaiting trial. Over objection, Pierce was permitted to testify: "He (the defendant) told me he shot Mr. Kitchen. . . . He said Mr. Kitchen pulled up on his right-hand side; and he told me they had been drinking that day. Ernest and the two people with him; and the colored man pulled up — Mr. Kitchen — told them why don't they behave theirselves and go on home; and Ernest told me, 'That black son of a bitch told me to behave myself and go home and I shot him.' "

At the conclusion of the State's evidence, the defendant first moved for a directed verdict of not guilty, and then that a verdict of not guilty be directed on the charge of murder in the first degree. The court overruled the motions. The defendant did not offer evidence. After the argument and charge of the court, the jury returned the verdict "guilty of murder in the 1st degree with recommendation that punishment be imprisonment for life in the State Prison." After denying the motion to set the verdict aside, the court imposed the mandatory life sentence. The defendant appealed.

*Robert Morgan, Attorney General, Ralph Moody, Deputy Attorney General, for the State.*

*Russell W. DeMent, Jr., for the defendant.*

HIGGINS, J.

The defendant argues here that the trial court committed four prejudicial and reversible errors. He contends: (1) Dr. Pate, the Pathologist who performed the autopsy on the body of George Edward Kitchen, was permitted to testify as to the cause of death, necessarily basing his opinion in part on facts not within his personal knowledge, which should have been the subject of a hypothetical question; (2) The defendant's motion for mistrial should have been allowed when Detective Johnson testified before the jury that at the time he arrested the defendant, he had two warrants, each of which charged assault with a deadly weapon; (3) The witness Pierce was permitted, over objection, to repeat to the jury certain admissions the defendant made while both were prisoners in the Wake County Jail; (4) The court should have withdrawn the charge of murder in the first degree because of the failure of the State to offer sufficient evidence of premeditation and deliberation.

Dr. Sparrow, who first treated the victim of the assault, actually traced the channel made by the bullet beginning at the left lower lip, through the teeth, through the tongue, and into the right tonsil, where the projectile was imbedded. He removed a lead bullet from the tonsil by means of forceps without the necessity of any cutting operation. He did not discover any damage beyond the tonsil wall. Only a complete blockage of the artery would have been discoverable at the time and by the type of examination he made.

[1] Dr. Pate, who qualified as a pathology expert, performed the autopsy. He traced the channel left by a projectile beginning at the left lower lip, through the teeth, tongue, and into the right tonsil. He dissected the artery just behind the tonsil and found that pressure had built up in front of the projectile which made the channel and had damaged the wall of the carotid artery, causing a blood clot within the artery. A part of the clot was carried to the brain, causing paralysis and death. The damage was revealed only by the autopsy. Dr. Pate testified: "If I excluded everything from my consideration except what I saw upon my examination, I would say with medical certainty that whatever projectile had entered the channel that I observed caused the death of the deceased. I can say this because of what I was able to find at the time of autopsy." In non-medical terms, the autopsy told him all he needed to know as to the

cause of death. As an expert in his field, Dr. Pate was qualified to testify as he did. *State v. Feaganes,* 272 N.C. 246, 158 S.E. 2d 89; *State v. Porth,* 269 N.C. 329, 153 S.E. 2d 10; *State v. Rhodes,* 252 N.C. 438, 113 S.E. 2d 917; *State v. Knight,* 247 N.C. 754, 102 S.E. 2d 259; *State v. Mays,* 225 N.C. 486, 35 S.E. 2d 494. The challenge to the testimony of Dr. Pate is not sustained.

[2]    During the course of the trial, the arresting officer in this case apparently had in his possession a warrant for the arrest of the defendant charging a felonious assault on Mr. Kitchen. This warrant was issued after the assault and before Kitchen's death. Apparently the officer also had a warrant for the defendant on another assault charge. When the solicitor asked the witness the question whether he had a warrant for the defendant's arrest, he volunteered the information that he had two warrants charging assault. After objection, Judge Carr instructed the jury to disregard the statement there was a second warrant. Any harmful effect of the officer's inadvertence, if error, was corrected by the court's instruction to the jury not to consider the testimony there was a second warrant. *State v. Battle,* 269 N.C. 292, 152 S.E. 2d 191; *State v. Bruce,* 268 N.C. 174, 150 S.E. 2d 216; *State v. Goldberg,* 261 N.C. 181, 134 S.E. 2d 334; *State v. Lane,* 166 N.C. 333, 81 S.E. 620. The objection on the ground the trial court committed error in denying the motion for a mistrial is not sustained.

[3]    As his third ground of challenge, the defendant contends the court committed error in permitting the witness Pierce to testify the defendant admitted he had shot Kitchen and his reasons for the shooting. Specifically, the defendant contends the court should have conducted a voir dire examination to determine whether the admissions to Pierce were freely and voluntarily made.

The defendant misinterprets the necessity for the voir dire examination to determine the voluntariness of his admissions to his jailmate Pierce. As a general rule, voluntary admissions of guilt are admissible in evidence in a trial. To render them inadmissible, incriminating statements must be made under some sort of pressure. Here we quote from the Supreme Court of the United States in *Hoffa v. United States,* 385 U.S. 293, 17 L. Ed. 2d 374: "Neither this Court nor any member of it has ever expressed the view that the Fourth Amendment protects a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it. . . . 'The risk of being overheard by an eavesdropper or betrayed by an informer or deceived as to the identity of one with whom one deals is probably inherent in the conditions of human

society. It is the kind of risk we necessarily assume whenever we speak.' (A)ll have agreed that a necessary element of compulsory self-incrimination is some kind of compulsion." The court did not commit error in permitting the witness Pierce to repeat the incriminating admissions the defendant voluntarily made to him while both were prisoners.

The fourth ground of objection to the trial (sufficiency of the evidence of premeditation and deliberation) is somewhat more troublesome than the three objections already discussed. The court, in a clear, concise and accurate charge (to which there is no objection) instructed the jury under what circumstances it should return one of these possible verdicts: (1) Guilty of murder in the first degree; (2) Guilty of murder in the first degree with the recommendation that punishment be imprisonment for life in the State's prison; (3) Guilty of murder in the second degree; (4) Guilty of manslaughter; (5) Not guilty.

[4-6] The court's instruction and the jury's verdict must be supported by evidence which permits the jury to find beyond a reasonable doubt that the defendant, with malice, after premeditation and deliberation, intentionally shot and killed George Edward Kitchen. In this case, malice may be presumed from evidence which satisfies the jury beyond a reasonable doubt that Kitchen's death proximately resulted from a pistol shot intentionally fired at him by the defendant. The finding would warrant a verdict of murder in the second degree. To sustain a verdict of murder in the first degree, the evidence must be sufficient to support a finding the fatal shot was fired after premeditation and deliberation. The courts define premeditation as "thought beforehand for some length of time, however short". Strong's N.C. Index 2d., Vol. 4, p. 196; *State v. Walters*, 275 N.C. 615, 170 S.E. 2d 484; *State v. Benson*, 183 N.C. 796, 111 S.E. 869. "Deliberation means . . . an intention to kill, executed by the defendant in a cool state of blood, in furtherance of a fixed design . . . or to accomplish some unlawful purpose, and not under the influence of a violent passion, suddenly aroused by some lawful or just cause or legal provocation." *State v. Faust*, 254 N.C. 101, 118 S.E. 2d 769.

[7, 8] On a motion to dismiss a count in the indictment charging murder in the first degree, the trial court must determine the preliminary question whether the evidence in its light most favorable to the State is sufficient to permit the jury to make a legitimate inference and finding that the defendant, after premeditation and de-

liberation, formed a fixed purpose to kill and thereafter accomplished the purpose. "No fixed length of time is required for the mental processes of premeditation and deliberation constituting an element of the offense of murder in the first degree, and it is sufficient if these processes occur prior to, and not simultaneously with, the killing." Strong's N.C. Index, *supra.*

[9]  "Premeditation and deliberation are not usually susceptible of direct proof, and are therefore susceptible of proof by circumstances. . . ." *State v. Walters, supra.* The court determines as a matter of law what is evidence. The jury must find from that evidence, beyond a reasonable doubt, that premeditation and deliberation anteceded the fatal shot.

[10]  The evidence as to what actually occurred before, at the time of, and following the killing comes from Stallings, brother-in-law of the defendant, and from Wilson, his companion and friend. Neither claimed the deceased started the difficulty. Both said that Stallings, driving the light colored automobile, overtook the deceased, and that discussion occurred between the defendant and the deceased as the vehicles were side by side. All the evidence disclosed the deceased admonished the defendant's party to go home and behave themselves. Nothing else is claimed to have come from the deceased.

The evidence disclosed the defendant fired three shots at a defenseless man who was at a place where he had a right to be and doing that which he had a right to do. Want of provocation, absence of excuse or justification, the number of shots fired, and the request of the defendant that they go back so he could finish the job permit a legitimate inference of premeditation and deliberation. This evidence was sufficient to go to the jury and be considered by it on the issue of murder in the first degree. *State v. Faust, supra; State v. Lamm,* 232 N.C. 402, 61 S.E. 2d 188.

The defendant did not offer evidence.

We conclude the evidence permitted and will support a finding that the defendant, with malice, premeditation and deliberation, shot and killed George Edward Kitchen. In the verdict and judgment, we find

No error.