STATE OF NORTH CAROLINA v. WILLIAM BERNARD PAYNE III

No. 557A83

(Filed 30 January 1985)

1. **Criminal Law § 87; Witnesses § 7— hypnotically refreshed testimony—harmless error**

In a prosecution for first degree murder where hypnotically refreshed testimony was introduced, there was no reasonable possibility that a different result would have been reached without the testimony because the hypnotized witness presented merely corroborative and cumulative testimony, did not add any matters of substance not presented through other witnesses, and did not prejudicially minimize the impact of a belt buckle found in a river because the belt played no important role in defendant's trial.

2. **Criminal Law § 76.2— no voir dire before admission of defendant's statements to jailmate—no request by defendant—no error**

The trial court did not err by failing to conduct *ex mero motu* a voir dire hearing as to the admissibility of testimony from defendant's jailmates where defendant moved before trial for an opportunity to be heard if the State attempted to introduce any evidence which could be subject to suppression, the trial court indicated that he would conduct a voir dire if he thought it necessary, and defendant did not subsequently request a voir dire. G.S. 15A-974.

**3. Criminal Law § 75.13— incriminating statements made to jailmates—admissible**

In a prosecution for first degree murder, incriminating statements made by defendant to and within the hearing of fellow jailmates were admissible where the evidence clearly showed that none of defendant's statements were induced by the witnesses; all of the witnesses approached the authorities about the statements, rather than vice versa; and there was no evidence tending to show that they had been placed in jail for the purpose of reporting statements or that any of the witnesses had been influenced in their actions prior to defendant making the statements to them.

**4. Constitutional Law § 63; Jury § 7.11— death qualified jury—no error**

The trial court did not err by death qualifying the jury.

**5. Criminal Law § 102.6— prosecutor's argument on the duty of prosecution versus duty of defense counsel—no error**

The trial court did not err by failing to interfere *ex mero motu* where the prosecutor commented during his closing argument that the prosecutor's duty is to see that the guilty are convicted and the innocent acquitted because defendant did not object during the argument, and the comment was within the wide latitude afforded counsel when considered with the State's opening argument and with the defense counsel's imputation of a lack of good faith in the investigation and prosecution of the defendant.

**6. Criminal Law § 181— motion for appropriate relief on appeal—no supporting affidavit—denied**

Defendant's motion for appropriate relief, filed in the Supreme Court, was denied where defendant failed to file supporting affidavits or other documentary evidence and the alleged fact on which the motion was based could not be ascertained from the record or transcript presented. G.S. 15A-1418, G.S. 15A-1420, Rule 37 N.C. Rules of Appellate Procedure.

Justice VAUGHN did not participate in the consideration or decision of this case.

BEFORE *Stevens, J.,* at the 8 August 1983 Session of Superior Court, ONSLOW County, defendant was convicted of first-degree murder. Pursuant to N.C.G.S. § 7A-27(a), he appeals from a judgment sentencing him to life imprisonment. Heard in the Supreme Court 13 December 1984.

Defendant was tried upon an indictment, proper in form, which alleged that he murdered William T. Whitehead on 28 May 1981. At that time, Whitehead was employed as a detective with the Jacksonville Police Department. Upon defendant's motion for a change of venue from Onslow County, the trial court ordered that a venire of jurors be drawn from Duplin County. The jury

was selected from this venire in proceedings held in the Superior Court, Duplin County. Defendant was thereafter tried and convicted of murder in the first degree in the Superior Court, Onslow County. Following a sentencing hearing conducted pursuant to N.C.G.S. § 15A-2000, the jury found that two aggravating circumstances existed: (1) the murder was committed to hinder the enforcement of the law and (2) the murder was committed against a law enforcement officer while he was engaged in the performance of his official duties. The jury also found the existence of certain mitigating circumstances. Although the jury found the aggravating circumstances to outweigh the mitigating circumstances, it concluded that these aggravating circumstances were not sufficiently substantial to call for the imposition of the death penalty. Upon the jury's recommendation of a life sentence, Judge Stevens sentenced defendant to a term of life imprisonment.

*Rufus L. Edmisten, Attorney General, by Special Deputy Attorney General Ralf F. Haskell, for the State.*

*Adam Stein, Appellate Defender, by Assistant Appellate Defender Gordon Widenhouse and First Assistant Appellate Defender Malcom Ray Hunter, Jr., for the defendant-appellant.*

MEYER, Justice.

Defendant has chosen to bring forward four assignments of error relating to the guilt-innocence phase of his trial. Chief among these is the assignment of error challenging the admission of testimony by a witness who underwent hypnosis prior to testifying. We find no prejudicial error in either the admission of this hypnotically refreshed testimony or in any other aspect of the defendant's trial.

I.

The State's evidence disclosed that on 28 May 1981, William T. Whitehead, a detective with the Jacksonville Police Department, was found dead in the New River in Jacksonville, North Carolina. Whitehead had been working undercover and when found, he was dressed in civilian clothes and his gun holster was empty. Whitehead's hands had been handcuffed behind his back. His unmarked patrol car had been found in the early morning

hours of 28 May, approximately 100 yards from the river, and his badge, radio and flashlight were discovered under a bridge which crossed the river. Later, his wallet was found under a bush near the USO Club. Whitehead was last seen alive at approximately 1:15 that morning by Reserve Officer James Brown, who had been watching a young white female (Naomi Kelly) going in and out of a bar called the Red Neck Saloon. Detective Whitehead had requested Brown to keep a watch on the Red Neck and on Ms. Kelly, whom Whitehead suspected of prostitution.

Whitehead had been primarily involved in narcotics investigations. The area near the bridge was known as a place where drug transactions and a rash of robberies occurred. It had rained heavily on 27-28 May and there was little physical evidence lifted from the scene of the crime.

Charles L. Garrett, the Onslow County Medical Examiner, testified that Detective Whitehead died from drowning, although he could not determine whether the victim was conscious when he drowned. Garrett also testified that he observed lacerations and bruises on Whitehead's face and head which were consistent with Whitehead's having been struck.

Zachary Beard, the State's chief prosecution witness, testified pursuant to a plea agreement with the prosecution whereby, upon his agreement to testify against defendant, he pled guilty to murder in the second degree in connection with Detective Whitehead's death, and received a fifteen year sentence.

Beard testified that he enlisted in the United States Marine Corps in 1976. He was absent without leave on several occasions, most notably from August 1980 to May 1981. Upon his return to Camp Lejeune in May 1981, he lived in the same barracks with defendant and they became good friends. They frequently traveled into Jacksonville together and were nearly always seen together there. One local tavern owner referred to the pair as "Mutt and Jeff." At this time, defendant began dating Naomi Kelly, whose mother was a waitress at the Red Neck Saloon. Beard dated Naomi's friend, Judy Mane (also known as "Pebbles"), who also worked at the Red Neck. Defendant and Beard frequently went to the Red Neck to drink beer and shoot pool.

Beard testified that just prior to 27 May, defendant came into the Red Neck Saloon and said that he had been busted by

Detective Whitehead for having marijuana. He testified further that late in the evening of 27 May 1981, he was playing pool and drinking beer in the Red Neck when defendant came into the bar, grabbed his girlfriend Naomi, and pulled her into a corner of the bar, hiding her. Beard asked defendant what was going on, and defendant replied, "Just get out of here and leave it go." Later, defendant pointed out Detective Whitehead to Beard and explained that he was trying to "bust" Naomi for prostitution. Beard described defendant as being aggravated and mad.

Beard stated that the Red Neck closed between 1:30 and 2:00 a.m. on 28 May. At that time, Beard, Naomi, Judy (Pebbles), Naomi's mother Connie, and defendant walked down the street to Tino's to eat breakfast. At 2:15 a.m., defendant left Tino's and went toward the Red Neck; Beard left shortly thereafter. Beard saw defendant arguing behind the bar in the Red Neck. Beard then went outside and was sitting on a pole behind the bar when he saw the defendant come outside, pace back and forth and slap the wall several times. Defendant then told Beard that he was going to the bridge. Since defendant seemed very upset, Beard waited a few minutes before following him toward the bridge.

As Beard approached the area, he saw Detective Whitehead looking under the bridge. He then observed defendant walk up behind Whitehead and strike him, causing Whitehead to fall to the ground. Initially, Beard walked away from the area after observing this act, but changed his mind and went to where defendant and Whitehead were. When he arrived, Beard observed defendant crouching over Whitehead's body, which was lying face down with the hands behind the back restrained by handcuffs. When Beard asked what was going on, defendant pulled a gun from the belt or waistband of his trousers and threatened to kill him if he did not assist defendant in placing the body in the river. Beard and defendant then pushed Whitehead's body into the water until the water level reached their knees. Defendant then grabbed the body by the ankles and pushed it under the water.

After placing Whitehead's body in the river, they proceeded toward Tino's, stopping along the way at the USO, where Beard observed defendant put the gun in his boot. This was near the area where Detective Whitehead's wallet was later found. The two returned to Tino's, having been gone for about thirty min-

utes. Defendant went inside, and came back out a few minutes later with Naomi, Connie and Pebbles. Beard and defendant walked the girls back to their apartment behind the Red Neck. Shortly thereafter, defendant and Beard went by taxi to Camp Lejeune, stopping at Camp Geiger on the way.

The following day, Naomi Kelly telephoned Beard and told him that Pebbles wanted him to come to town to talk with her. When Beard arrived in town, he found that defendant, rather than Pebbles, wanted to talk to him. Defendant warned Beard never to mention what had happened at the bridge the previous night.

In July 1981, Beard again deserted the Marine Corps. Law enforcement authorities found him in Iowa in February 1983. On cross-examination, Beard admitted being a suspect in the White-head murder because the police found his belt in the New River. Beard stated that he lost it while swimming alone a week before the murder. Beard further stated that he was not questioned by the police about the belt until February of 1983.

Connie Blackburn, Naomi Kelly's mother, testified that in May 1981, she was working as a waitress at the Red Neck Saloon and she was living in an apartment behind the bar with her husband Clarence and Naomi. At that time, Naomi was dating the defendant.

At about 1:45 a.m. on 28 May, defendant, Zack Beard, Pebbles and Naomi came into the bar and asked Ms. Blackburn if she wanted to go to Tino's with them to have coffee. Defendant stated that he was buying. After checking with her husband, they walked to Tino's. While enroute, Ms. Blackburn noticed some people standing near the Jazz Land Bar and a detective's car driving slowly toward them as if he were looking for someone in particular.

When the group arrived at Tino's they all went inside and sat down. After a while, defendant and Beard left, stating that they were going to get a cab, but returned approximately thirty minutes later. After that, defendant paid the bill and they all left Tino's.

Later that day, Ms. Blackburn was awakened by police officers who wanted to take her daughter Naomi for questioning.

She accompanied Naomi to the police station and then, upon returning to her apartment, overheard defendant ask her husband Clarence if he knew where defendant could get rid of a gun.

Naomi Kelly also testified and corroborated much of Beard's and her mother's testimony regarding the evening of 27 May. She stated that defendant told her Detective Whitehead was watching her and that defendant seemed angry. She also recounted how she, her mother, Pebbles, Beard and defendant went to Tino's after the Red Neck closed. Kelly stated that Beard and defendant left the others at Tino's and returned about thirty minutes later. According to Kelly, the two went to look for Beard's belt which he had left at the river while swimming. Kelly stated that Beard had lost the belt on 27 May when he dove into the water to retrieve a hairbrush, apparently after she, defendant and Pebbles dared him to go in the water after it.

Kelly also indicated that she had been questioned by the police on 28 May 1981. Later that afternoon, defendant asked her what she told them, stating, "Tell me what they asked you and what you said, so I'll know what to say." Kelly also testified that she saw defendant with a gun later that afternoon when he asked her stepfather if he knew anyone who might want to buy a gun. Present during both conversations were Kelly, Zachary Beard, Pebbles, defendant, Connie and Clarence Blackburn.

Barbara Bowman testified that in 1981, she owned a bar in Jacksonville called Barb's Place, and had known Detective Whitehead for some time. She stated that on various occasions, she talked with Detective Whitehead regarding prostitution and drugs in the area, and on one occasion had been asked by Whitehead if she knew Naomi Kelly. Ms. Bowman testified that in the latter part of April, or early part of May 1981, Detective Whitehead questioned her about activities in the Red Neck Saloon in particular. In addition, Ms. Bowman testified about ill will or animosity the defendant had toward Detective Whitehead and that defendant had called Whitehead a "mother f---er" after a confrontation between the two.

Four fellow jailhouse inmates of defendant and Beard testified for the prosecution. David Harris testified that he met the defendant for the first time when they became cellmates in the Onslow County jail. On 12 March 1983, he and defendant were ly-

ing on their bunks talking and defendant stated that he had handcuffed Mr. Whitehead and that Zachary Beard had hit Whitehead in the head. Harris did not question the defendant further about his involvement. Harris testified further that after he became a trustee, defendant asked Harris to do him a favor and go to Mr. Beard's cell and get information for him about the crime. When Harris said that he could not do that, defendant told Harris that if he did not, defendant would kill him "too."

Two other jailmates, Kenneth Tyler and Chad Hoppe, testified about an incident which occurred on 4 May 1983, at which time defendant went on a rampage and started yelling out loud that he had killed Detective Whitehead and that he had a "snitch" in Cellblock 3 (Zachary Beard) and that he should have killed Beard that night also and that he would kill Beard if he got "out of here."

The fourth jailmate witness, Robert Taylor, was also a cellmate of defendant at one time. Taylor testified that he and defendant talked frequently and that they had discussed defendant's involvement in the killing of Detective Whitehead. Defendant told Taylor that Whitehead had once busted him at the Red Neck Saloon for marijuana. On another occasion, defendant told Taylor that if he had killed Beard he would not have any witnesses against him.

The defendant testified on his own behalf. Defendant did not testify as to the events occurring on the evening of 27 May or the early morning hours of 28 May, except to testify that he did not kill Detective Whitehead. Defendant further denied having made any statement in the jail about his having killed Whitehead. In addition, defendant testified that on the afternoon of 27 May, Naomi and Beard had gone swimming together in the area near the bridge.

On cross-examination, defendant testified that he, Beard, Naomi and Pebbles went in and out of the Red Neck Saloon several times on the night Whitehead was killed. Defendant admitted having gone with Beard, Naomi and Pebbles to a trailer to purchase drugs and returning with them to the Red Neck. He stated that Beard left the bar around 12 o'clock and that he did not see Beard again until the next day. Defendant testified that he stayed at the Red Neck until it closed, left Naomi at the bar and went

toward Tino's to get a cab and then returned to the base. Defendant generally denied the other details of the events of that evening testified to by Beard, Naomi and Connie Blackburn.

Judy Mane (Pebbles) testified for the defendant. She indicated that neither defendant nor Beard went to Tino's with her, Naomi and Naomi's mother on the night that Detective Whitehead died. She also stated that Beard and Kelly had been swimming in the river late that afternoon without the defendant.

## II.

Defendant, relying on the recent decision of this Court in *State v. Peoples*, 311 N.C. 515, 319 S.E. 2d 177 (1984), contends that he is entitled to a new trial because the testimony of prosecution witness Naomi Kelly had been hypnotically refreshed prior to defendant's trial and was therefore inadmissible. Defendant argues that the erroneous admission of this hypnotically refreshed testimony cannot be considered harmless in that Kelly's testimony was critical to the State's case in its "corroboration of the testimony of the accomplice turned-key-witness Beard." In addition, defendant maintains that because the jury knew Kelly had been hypnotized, the jury was likely to have accorded her testimony, which was corroborative of Beard's account, undue reliability and credibility, thereby enhancing the prejudicial impact of her testimony. We do not agree.

In *Peoples* this Court examined the scientific validity and acceptance of hypnosis with regard to its use for courtroom purposes and concluded that "hypnotically refreshed testimony is simply too unreliable to be used as evidence in a judicial setting." 311 N.C. at 532, 319 S.E. 2d at 187. In overruling our earlier decision which held that the fact that a witness had been hypnotized was a consideration relating only to the credibility rather than the admissibility of the evidence, *State v. McQueen*, 295 N.C. 96, 244 S.E. 2d 414 (1978), we identified several problems inherent in the hypnotic process. These flaws include the subject's enhanced suggestibility, his tendency to "confabulate"[1] when gaps exist in

---

1. In *Peoples* we noted that experts in the area of hypnosis generally agree that hypnotized subjects *confabulate*, that is, "invent details to supply unremembered events in order to make their account complete and logical, as well as acceptable to the hypnotist." 311 N.C. at 521, 319 S.E. 2d at 181, *citing* Diamond,

State v. Payne

the pre-hypnotic memory, the subject's enhanced confidence in the truthfulness and accuracy of his post-hypnotic recall, a tendency which may preclude effective cross-examination, and the inability of either experts or the subject to distinguish between memory and confabulation. *Peoples*, 311 N.C. at 532, 319 S.E. 2d at 187. Given these difficulties associated with hypnosis, we articulated the rule that "[a] person who has been hypnotized may testify as to facts which he related before the hypnotic session. The hypnotized witness may not testify to any fact not related by the witness before the hypnotic session." *Id.* at 533, 319 S.E. 2d at 187. The record in this case indicates that in May 1981 prior to undergoing hypnosis Kelly gave only a very brief statement to the police in which she generally denied any involvement with the Whitehead murder. Under *Peoples* most of her testimony would, on the basis of this record, appear to be inadmissible.

[1] However, although we held hypnotically refreshed testimony to be inadmissible in judicial proceedings in the *Peoples* decision, we further held that in applying this new rule retroactively to all cases which had not been finally determined on direct appeal as of the date on which *Peoples* was certified,[2] a defendant will not necessarily be entitled to a new trial where hypnotically refreshed testimony has been admitted. In so holding, this Court stated:

> [W]e will examine each appeal on a case-by-case basis to determine if the error was reversible, i.e., whether a reasonable possibility exists that a different result would have been reached at the trial had the evidence not been erroneously admitted. The use of this harmless-error analysis will allow us to correct errors in which the truth-seeking process was tainted by the hypnotically refreshed testimony while imposing minimum adverse impact on the administration of justice.

311 N.C. at 534-35, 319 S.E. 2d at 189.

Based upon our careful examination of the record in this case, we conclude that no reasonable possibility exists that a dif-

"Inherent Problems in the Use of Pretrial Hypnosis of a Prospective Witness," 68 Cal. L. Rev. 313, 342 (1980).

2. The opinion in *State v. Peoples* was certified on 17 September 1984 and this case falls in the group designated for retroactive application of the *Peoples* rule.

ferent result would have been reached had Naomi Kelly's testimony not been admitted in defendant's trial.

Defendant grounds his argument that admission of Kelly's hypnotically refreshed testimony was prejudicial error on his contention that Kelly was the only material witness other than Beard (1) who testified as to the details of defendant's and Beard's actions on the evening immediately prior to the killing of Detective Whitehead, (2) who placed defendant with Detective Whitehead's gun after the killing, and (3) who showed defendant's anger toward Detective Whitehead. However, this contention is not supported by the evidence of record.

First, in sharp contrast to *State v. Peoples*, 311 N.C. 515, 319 S.E. 2d 177, where the State's key accomplice-witness was hypnotized prior to trial, in the instant case the hypnotized witness' testimony merely corroborated testimony presented by the State through a number of other witnesses, including Zachary Beard, all of whom gave testimony consistent with one another. Thus, the potential prejudicial impact of her testimony is greatly lessened in comparison to the erroneously admitted testimony in *Peoples*.

Secondly, Kelly's testimony did not add any additional matters of substance not presented through other witnesses. Furthermore, only Beard testified as to the actual killing of Detective Whitehead by the defendant during one of their unexplained absences from the company of Naomi, Pebbles and Connie Blackburn on the morning in question.

A review of the record shows that both Beard and Connie Blackburn, Kelly's mother, testified in detail as to defendant's actions during the evening of 27 May 1981, up to approximately 2:15 a.m. the following morning, when Beard and defendant went off by themselves. Both witnesses also testified that Beard and defendant returned approximately thirty minutes later and that the two men left together after all the others had returned to the Red Neck Saloon. Kelly's testimony added nothing of any substance to this version of the events.

Further, Kelly's testimony about the ill will or hate shown by defendant toward Detective Whitehead on that evening was merely corroborative and cumulative of testimony to that effect presented by Beard, Reserve Officer Brown, bar owner Barbara

Bowman and prison jailmate Robert Taylor. Each of these witnesses related either statements of the defendant regarding his arrest by Detective Whitehead for marijuana or statements by Whitehead concerning his suspicion that defendant's girlfriend Naomi Kelly was engaged in prostitution.

The only other matter of substance that Kelly testified to which tended to relate defendant to the murder concerned defendant's efforts to sell a gun the day following Detective Whitehead's death. However, this testimony too was only corroborative and cumulative of testimony by Beard and Connie Blackburn to the same effect.

The defendant's final contention regarding the prejudicial impact of Kelly's testimony is that it minimized the impact of Beard's belt being discovered in the river. The prosecution presented no direct testimony that a belt, let alone Beard's belt, had been found at the river near where Detective Whitehead was killed and his body found. Neither of the crime scene technicians mentioned a belt in connection with their investigation. The only mention of a belt being found was by the defendant himself, who stated that when being questioned by the police on 28 May, he was asked if he knew that they had found Beard's belt near the bridge, and Beard's statement that he had lost a belt buckle at the bridge three days before the killing. From the testimony presented, we conclude that the discovery of Zachary Beard's belt in the river played no part in the State's case-in-chief and played only a minimal role in defense counsel's presentation. Therefore, Kelly's testimony concerning the belt, which was elicited for the first time by defense counsel on cross-examination, cannot be said to have minimized the import of this fact, as it played no important part in the defendant's trial to begin with.

The foregoing review of the record demonstrates that Kelly's testimony was mostly cumulative to testimony presented through other witnesses in addition to Beard. Much other evidence was presented by the State which pointed to the defendant's guilt. Moreover, in his argument defendant ignores the testimony of the four jailmates concerning statements made by defendant while in custody in the Onslow County jail regarding his involvement in the crime.

Accordingly, we conclude that had any or all of Naomi Kelly's testimony as to the sequence of events, the discovery of Beard's belt in the river, the ill will of the defendant toward the victim or attempts by the defendant to sell the victim's gun been omitted from evidence, no reasonable possibility exists that the jury would have reached a different verdict as to defendant's guilt. Each of the witnesses presented by the State gave testimony which tended to corroborate the testimony of the other witnesses, independent of the testimony of Naomi Kelly. The total picture of the events of 27-28 May given by each of these witnesses is both internally consistent and consistent with the defendant's having killed Detective Whitehead in the early morning hours of 28 May 1981. In this context, any necessity for the prosecution to corroborate the testimony of the accomplice witness Zachary Beard with Naomi Kelly's testimony is considerably undercut. The erroneous admission of this evidence was harmless.

III.

[2] Prior to trial, defendant moved for an opportunity to be heard if the State attempted to introduce evidence which could be subjected to suppression. Defendant gave no legal or factual basis for suppression, nor did he put the court on notice as to what evidence might be subject to suppression. In response, the trial judge stated:

THE COURT: I don't know of anything, but if it comes up, even in the future, even on the day of the trial, upon your objection, or even without it, I will assure you I will have a voir dire on the suppression *if I think it's necessary* whether either one of you moves for it or not. (Emphasis added.)

During the State's case-in-chief, David Harris, Kenneth Tyler, Robert Taylor and Chad Hoppe testified regarding inculpatory statements they heard defendant make during his pretrial incarceration in the Onslow County jail. At no time during or after the testimony of these witnesses did defendant object, request a voir dire or move to strike any part of their testimony. Nevertheless, defendant now contends that the trial court erred in failing to conduct, *ex mero motu*, a voir dire hearing on the admissibility of their testimony. Specifically, defendant maintains that such a hearing is necessary to determine whether these witnesses were operating at the behest of the State and whether

they elicited or heard the statements allegedly made by the defendant in violation of defendant's sixth amendment right to counsel. *See United States v. Henry,* 447 U.S. 264, 65 L.Ed. 2d 115 (1980); *Massiah v. United States,* 377 U.S. 201, 12 L.Ed. 2d 246 (1964).

Upon the trial judge's indication to defendant that a voir dire hearing would be conducted on the admission of evidence subject to suppression, when the *judge* felt it necessary ("If I think it's necessary."), defendant was put on notice of the need to object and request a voir dire hearing, when *deemed appropriate by defense counsel.* Nonetheless defendant failed to request a voir dire. The court's statement should not have been taken as an invitation by defense counsel to fail to object to testimony *he* considered inadmissible, thereby inviting error by the trial court.

Where no objection is lodged, the admission of incompetent evidence will not serve as grounds for a new trial, despite an assertion that the evidence was obtained in violation of a defendant's rights under either the constitution of the United States or of this State. *State v. Foddrell,* 291 N.C. 546, 231 S.E. 2d 618 (1977). Therefore, defendant waived his right to contest the admissibility of these statements into evidence on appeal.

Even were we to consider defense counsel's pretrial request to be heard during the trial as an objection to any testimony subject to suppression, defendant would not be entitled to the relief he now requests. At most, the request to be heard could be considered a general objection, in that defense counsel failed to specifically allege a legal or factual basis for suppression of his fellow jailmates' testimony. A general objection to testimony the admissibility of which could be challenged pursuant to a ground specified in N.C.G.S. § 15A-974 may be summarily denied at trial where the defendant's general objection fails to allege a specific legal or factual basis for his contention that the evidence objected to was obtained in violation of his constitutional rights. *See State v. Satterfield,* 300 N.C. 621, 268 S.E. 2d 510 (1980). Accordingly, the trial court did not err in failing to conduct, *ex mero motu,* a voir dire hearing as to the admissibility of the jailmates' testimony in this case.

[3] Even assuming *arguendo* that the admissibility of the questioned statements had been properly challenged below, contrary

to defendant's contentions, the record before us does sufficiently reveal the posture of the four jailmate witnesses vis-a-vis the prosecution. The record clearly demonstrates that the witnesses were not acting at the behest of the State when the statements were overheard and that the statements were not in any way improperly influenced or obtained and were therefore admissible.

David Harris testified that on 12 March 1983, he and defendant were talking about religion when defendant, of his own volition suddenly stated that he had handcuffed Detective Whitehead. Harris further testified that he did not question defendant about his statement and that the authorities had not approached him, but that he first approached his attorney, and then the authorities concerning these statements.

Robert Taylor testified that while he and the defendant were incarcerated together they talked frequently. Defendant told Taylor that Detective Whitehead had once "busted" him at the Red Neck Saloon for marijuana. On another occasion, defendant stated to Taylor that if he had killed Beard he would not have any witness against him.

On cross-examination, Taylor testified that defendant had initiated both statements and that at the time they were made to him, Taylor did not think these statements were any of his business. He told no one about them until he talked with the district attorney a week before defendant's trial.

Kenneth Tyler testified that on 4 May 1983, defendant went on a rampage concerning his involvement in the killing of Detective Whitehead. During this rampage Tyler overheard defendant yell "Yes, sir, I have a snitch down in Cell 3 with me. His name is Zack Beard," and "Yes, I killed—I killed Mr. Whitehead." At the time, Tyler was in Cellblock 4 and defendant in Cellblock 3. Later, after Tyler was placed in the same cellblock with the defendant, defendant told him that the only thing Beard had to do with the murder was that Beard helped him pull Whitehead into the water, and that he was not worried about anybody testifying against him because if they did, they would have to answer for it.

On cross-examination, Tyler testified that three or four days after defendant told him that he had killed Detective Whitehead, he reported the statement to a prison captain. Until Tyler was ap-

proached by the district attorney about a week before defendant's trial, he spoke to no one about the matter except jailmate Chad Hoppe. Tyler further testified that he, not Hoppe, brought up the subject of defendant and the statements while the two were engaged in a general conversation.

Chad Hoppe testified that on the evening of 4 May 1983, he was in Cellblock 8 and defendant in Cellblock 4 when defendant started yelling out that he had killed Detective Whitehead. At that time, another jailmate had said something about "swimming with handcuffs" when defendant apparently got mad and made a comment about snitches in Cellblock 3, Zack Beard's cellblock. After that, defendant indicated that he was referring to Zachary Beard, got quite angry and stated, "You damn right I killed him" and "I ought to killed that sorry mother f--er on the night on the bridge and I wouldn't have to worry about nobody snitching on me."

Hoppe testified on cross-examination that he later told Zachary Beard about overhearing defendant's statements after Hoppe overheard Beard discussing them with another jailmate. After that, Beard asked Hoppe if he would testify to what he heard and make a written statement for his attorney. Hoppe denied acting as a go-between for anyone.

In *State v. Perry*, 276 N.C. 339, 345-46, 172 S.E. 2d 541, 546 (1970), we stated:

> The defendant misinterprets the necessity for the voir dire examination to determine the voluntariness of his admission to his jailmate Pierce. As a general rule, voluntary admissions of guilt are admissible in evidence in a trial. To render them inadmissible, incriminating statements must be made under some sort of pressure. Here we quote from the Supreme Court of the United States in *Hoffa v. United States*, 385 U.S. 293, 17 L.Ed. 2d 374: "Neither this Court nor any member of it has ever expressed the view that the Fourth Amendment protects a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it. . . . 'The risk of being overheard by an eavesdropper or betrayed by an informer or deceived as to the identity of one with whom one deals is probably inherent in the conditions of human society. It is the kind of risk we

necessarily assume whenever we speak.' [A]ll have agreed that a necessary element of compulsory self-incrimination is some kind of compulsion." The court did not commit error in permitting the witness Pierce to repeat the incriminating admissions the defendant voluntarily made to him while both were prisoners.

*See also State v. Monk*, 291 N.C. 37, 47-48, 229 S.E. 2d 163, 170-71 (1976).

The evidence plainly shows that the incriminating statements made by defendant to, and within the hearing of, fellow jailmates Harris, Taylor, Tyler and Hoppe were volunteered by defendant and were not made under any compulsion or as a result of any impropriety on the part of the police or prosecution. While defense counsel cross-examined each of these witnesses extensively as to whether they were acting as government agents at the time these incriminating statements were made, their testimony demonstrates that they were not.

Their testimony clearly shows that none of defendant's statements were induced by these witnesses, but were initiated by the defendant himself. All of these witnesses testified that they approached the authorities first, and not vice-versa, concerning defendant's statements. Furthermore, no evidence was presented tending to show that they were either placed in the jail for purposes of reporting any statements made to them by defendant or that any of these witnesses were approached or influenced in their actions prior to defendant having made the statements to them.

Accordingly, this is not a situation like that presented in *United States v. Henry*, 447 U.S. 264, 65 L.Ed. 2d 115, relied upon by defendant, where a paid informant deliberately engaged the incarcerated defendant in conversation for purposes of producing incriminating statements, or like that presented in *Massiah v. United States*, 377 U.S. 201, 12 L.Ed. 2d 246, where a codefendant agreed to help the prosecution by allowing his car to be wired and then engaging the defendant in a lengthy conversation in order to elicit incriminating statements from him.

Rather, the challenged statements in this case were clearly voluntary statements made by the defendant to other jailmates

who had no prior arrangement with the authorities to elicit such statements. The trial court, therefore, did not err in permitting the incriminating admissions defendant voluntarily made to be admitted into evidence and defendant has failed to demonstrate the need for a further hearing on the question of admissibility. *State v. Monk*, 291 N.C. 37, 229 S.E. 2d 163; *State v. Perry*, 276 N.C. 339, 172 S.E. 2d 541. *See also State v. Barnett*, 307 N.C. 608, 300 S.E. 2d 340 (1983).

## IV.

**[4]** Next, the defendant contends that the practice of "death qualifying" the jury before the guilt-innocence phase of his trial resulted in a jury biased in favor of the prosecution on the question of guilt or innocence and deprived him of a fair trial.

The defendant acknowledges that this question was decided against him in *State v. Avery*, 299 N.C. 126, 261 S.E. 2d 803 (1980), and that position has been consistently reaffirmed by this Court in *State v. Boyd*, 311 N.C. 408, 319 S.E. 2d 189 (1984); *State v. Pinch*, 306 N.C. 1, 292 S.E. 2d 203, *cert. denied*, 459 U.S. 1056, 74 L.Ed. 2d 622, *reh'g denied*, 459 U.S. 1189, 74 L.Ed. 2d 1031 (1982) and *State v. Hamlet*, No. 228A83 (slip opinion filed 6 November 1984). Nonetheless, defendant, without citing any new authority or advancing any new reasons, asks this Court to reconsider its holdings on this issue and grant the defendant a new trial. We decline to do so and once again reaffirm the decision reached in *State v. Avery*, 299 N.C. 126, 261 S.E. 2d 803.

## V.

**[5]** In his concluding argument, defendant contends that the district attorney improperly commented in his closing argument upon the respective roles of the prosecution and defense counsel in the prosecution of a criminal case, thereby denying defendant a fair trial.

The portion of the prosecutor's argument to which defendant objects was made during the State's closing argument by District Attorney Andrews, who stated:

> [T]he defense attorneys—it's their duty to defend the man to the best of their ability. That's their sole duty in this case— to defend them to the best of their ability. That's not the

Prosecutor's duty to defend anybody to the best of its ability. The Prosecutor's duty is to see that justice is done, to see the guilty are convicted and innocent are acquitted. They don't have that double duty, so to speak, like we prosecutors have. Their sole duty is to try to get that man off and to do it to the very best they can within the limits of the law.

Defendant maintains that the prosecutor's statement was equivalent to a personal guarantee to the jury that the defendant was guilty, "because it would be contrary to the prosecutor's duty to see that justice is done, to urge the jury to convict a person the prosecutor was not convinced was guilty." Defendant concludes that if the jury believed and accepted this unchallenged declaration by the prosecutor, "then defendant's right to a fair trial was surely destroyed." We do not agree with this contention.

First, the record reveals that no objections were made by defendant during the prosecutor's closing argument. Therefore, the only question for review is whether the prosecutor's remarks amounted to such gross impropriety as to warrant the trial judge's intervention, *ex mero motu. State v. Kirkley*, 308 N.C. 196, 302 S.E. 2d 144 (1983); *State v. Johnson*, 298 N.C. 355, 259 S.E. 2d 752 (1979).

Second, it is well settled that counsel are allowed wide latitude in arguments to the jury in contested cases. They are allowed to argue to the jury the law and facts in evidence and all the reasonable inferences to be drawn therefrom. *See, e.g., State v. Pinch*, 306 N.C. 1, 292 S.E. 2d 203 and *State v. Lynch*, 300 N.C. 534, 268 S.E. 2d 161 (1980). Counsel may also defend their own tactics, as well as those of the investigating authorities, when challenged. *See, e.g., State v. Moose*, 310 N.C. 482, 313 S.E. 2d 507 (1984) and *State v. Davis*, 305 N.C. 400, 290 S.E. 2d 574 (1982). However, counsel may not argue to the jury incompetent and prejudicial matters and may not travel outside the record by injecting facts and personal opinions not included in evidence. *State v. Lynch*, 300 N.C. 534, 68 S.E. 2d 161. Our review of the record reveals no such grossly improper statements by the district attorney in his closing argument which would require the trial judge to intervene, *ex mero motu*, to correct the argument.

When the prosecution's jury argument is considered as a whole, as it properly must be, the statement defendant now inter-

prets as a "personal guarantee" of defendant's guilt takes on its true meaning. In the State's opening argument, District Attorney Vatcher carefully reviewed for the jury the respective roles of the prosecution and defense counsel in a criminal proceeding:

> The prosecution of one charged with a criminal offense is, of course, an adversary proceeding. As a prosecuting attorney it is our duty to represent the State of North Carolina. As such, it's not only our right but duty to argue for and seek the State's objective in the proceeding at hand. *This objective is not conviction of the Defendant regardless of guilt*; nor is it punishment disproportionately [sic] to the circumstances. *But it's the conviction of the guilty; the acquittal of the innocent;* and punishment commensurate with the offense in the interest of future protection of our society. *And as the advocate for the State of North Carolina, I must represent that interest.* (Emphasis added.)

Against this background, it is unlikely that the jury attributed the meaning which defendant has to the district attorney's later reference to the role of defense counsel in the adversary system. Furthermore, in his closing argument, defense counsel suggested a lack of good faith on the part of the district attorney in the prosecution of defendant and further attacked the credibility and actions of the police officers investigating the case. For example, defense counsel argued:

> Now, if we take the State's case, and I've been practicing criminal law for fifteen years and I've never seen a case like this before. . . . I have never, ever seen a case with the kind of witnesses that they have produced ever and couldn't possibly imagine these kind of witnesses coming into court and couldn't possibly imagine the State asking you to believe these witnesses. I have never seen it before, and I hope I never see it again.

Additionally, defense counsel attempted to personalize the case and invited the jury to consider matters other than the guilt or innocence of the defendant, characterizing the case as follows:

> It's an appeal to your emotions and an appeal to your prejudice, and an attempt to get you to come back with a verdict of guilty with absolutely nothing but a bare accusation. It's

unfair. It's not right. And it's not proper. And it shouldn't go on in a court of law. It should not. And you should not sanction it. And you should not say to the District Attorney we approve of this. This is the kind of drum we have been waiting to hear, the kind of tom-tom we wanted to hear. So we come back with a conviction. I say it was improper. And I say that they have no such statements. And I say that they know they have no such statements. And I say that it's one more attempt to bolster and make a case where none exists. . . .

\* \* \*

[T]oday you decide not just the guilt or innocence of Billy Payne, but you decide something even more important than that. You decide whether or not you are going to condone prejudice, scare tactics, whether you are going to swing, go along with what everybody else thinks ought to be done.

These and other similar arguments on the part of defense counsel clearly suggest a lack of good faith in the investigation and prosecution of the defendant for the murder of Detective Whitehead. When the challenged portion of the district attorney's closing argument is read contextually, and in light of defense counsel's argument, it is clear that it was made in rebuttal to defense counsel's imputations of bad faith and not for the purpose of claiming the title of impartial champion of justice for the prosecution. As an attempt to rebut defense counsel's imputations of bad faith, the district attorney's argument was within the wide latitude allowed counsel in their jury arguments, particularly when their own tactics are challenged. The trial court did not, therefore, err in failing to interfere, *ex mero motu.*

## VI.

Finally, both the State and the defendant have filed motions for appropriate relief, the State pursuant to N.C.G.S. § 15A-1416 (motion by the State for appropriate relief) and Rule 37 of the North Carolina Rules of Appellate Procedure and the defendant pursuant to N.C.G.S. § 15A-1418 (motion for appropriate relief in the appellate division). Both motions relate to testimony inadmissible under *State v. Peoples,* 311 N.C. 515, 319 S.E. 2d 177.

By its motion, the State requests that should this Court determine that the admission of Naomi Kelly's testimony, if error, would not have constituted harmless error, appropriate relief be granted the State in the form of a hearing upon remand to the trial tribunal for a determination on the question of whether Naomi Kelly's testimony was improperly tainted by her pretrial hypnotic session. In view of our determination that the admission of Kelly's testimony was harmless error, we deny the relief requested by the State in its motion.

[6] The defendant's motion relates to the admissibility of witness Zachary Beard's testimony under the retroactive application of the rule of *Peoples*. The motion contains the following statement:

> 4. In discussions with defendant's trial counsel and others associated with this case, the undersigned appellate counsel, who was not involved in the trial proceedings, is informed and believes that Zachary Beard, another witness in this case, was also hypnotized prior to testifying at defendant's trial. Beard allegedly was defendant's accomplice and testified pursuant to a plea agreement with the State, whereby he pled guilty to second degree murder and received the presumptive fifteen-year prison sentence.

> 5. Beard gave a number of recorded statements to law enforcement authorities. The fact of his hypnosis is not a part of the record. It is impossible, without an evidentiary hearing, to ascertain the date(s) of his hypnosis and to compare such date(s) with the dates of his prior recorded statements.

However, no supporting affidavits or other documentary evidence accompanies defendant's request for appropriate relief.

N.C.G.S. § 15A-1420, which governs the procedure for filing a motion for appropriate relief clearly requires supporting affidavits to accompany the motion in a case such as this. Subsection (c)(6) provides that a "defendant who seeks relief by motion for appropriate relief must show the existence of the asserted ground for relief. Relief must be denied unless prejudice appears, in accordance with G.S. 15A-1443." Subsection (b)(1), entitled "Supporting Affidavits" provides as follows:

A motion for appropriate relief made after the entry of judgment must be supported by affidavit or other documentary evidence if based upon the existence or occurrence of facts which are not ascertainable from the records and any transcript of the case or which are not within the knowledge of the judge who hears the motion.

Accordingly, because defendant submitted no supporting affidavits or other documentary evidence tending to show that Zachary Beard did in fact undergo hypnosis prior to defendant's trial and this alleged fact is not ascertainable from the record or transcripts submitted, we cannot address the merits of defendant's request for appropriate relief with regard thereto. Defendant's motion is therefore denied.

We have carefully reviewed the record, transcripts and briefs of the parties in this case and conclude that defendant received a fair trial, free from prejudicial error.

No error.

Justice VAUGHN did not participate in the consideration or decision of this case.